# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ALLIED PROPERTY & CASUALTY INSURANCE COMPANY and AMCO INSURANCE COMPANY, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | No. 15 C 3925 |
| v. | ) ) | Judge Jorge L. Alonso |
| METRO NORTH CONDOMINIUM ASSOCIATION, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In this diversity case, plaintiffs, Allied Property & Casualty Insurance Company ("Allied") and AMCO Insurance Company ("AMCO"), seek a declaration that certain commercial liability insurance policies they issued to a subcontractor who participated in the construction of a condominium project do not cover an underlying claim against the subcontractor stemming from its defective workmanship. Defendant Metro North Condominium Association ("Metro North"), to whom the subcontractor assigned its right to recover the insurance proceeds in settlement of the underlying lawsuit, has counterclaimed, seeking a declaration that the underlying claim is covered and plaintiffs owe Metro North the amount it is due under the settlement agreement with the subcontractor. The parties have filed cross-motions for summary judgment. For the reasons set forth below, plaintiffs' motion is granted, and Metro North's motion is denied.

# BACKGROUND

Metro North is the governing body of a condominium located at 3946 North Ravenswood Avenue in Chicago. (Pls.' LR 56.1(b)(3)(B) Resp., ¶ 1, ECF No. 26, at 4.) Metro North filed a lawsuit in the Circuit Court of Cook County against the developer of the condominium and a number of its contractors and subcontractors for defective construction that caused various issues, including water infiltration. (Def.'s LR 56.1(b)(3)(B) Resp., ¶ 5, ECF No. 22; Def.'s App., Ex. 3b, 4th Am. Compl., ECF No. 24-4.) Among the subcontractors named in Metro North's state-court complaint were CSC Construction, Inc. ("CSC Construction") and CSC Glass, Inc. ("CSC Glass") (collectively, "the CSC entities"). (Def.'s App., Ex. 3b, 4th Am. Compl., ¶¶ 16-17, ECF No. 24-4.) According to the allegations of the complaint, CSC Construction "and/or CSC Glass entered into a subcontract . . . to provide window and glazing services for the [p]roject" (*id.*, ¶ 18), but, beginning with an October 2006 rainstorm, serious water infiltration issues soon arose (*id.*, ¶¶ 59-61) due to "CSC [Construction] and/or CSC Glass'[s] construction errors and omissions" (*id.*, ¶ 100). Metro North claimed that, based on these construction defects and the damage they caused to the building and to the unit owners' personal property, the CSC entities were liable for breach of the implied warranty of habitability ("BIWH").[1] (*Id.*, ¶¶ 151-66.)

Allied issued a commercial general liability ("CGL") policy, effective from March 30, 2006, to March 30, 2007, to CSC Glass. (Def.'s LR 56.1(b)(3)(B) Resp., ¶ 3, ECF No. 22.) AMCO issued a commercial umbrella liability policy to CSC Glass for the same effective period. (*Id.*) Allied provided the CSC entities with an independent defense in the underlying

---

[1]Metro North claimed that the implied warranty of habitability applies to the subcontractors responsible for the construction defects because the entity that served as the developer and general contractor was insolvent. (Def.'s App., Ex. 3b, 4th Am. Compl., ¶ 134 n. 1, ECF No. 24-4 (citing *Minton v. Richards Grp. of Chi.*, 452 N.E.2d 835, 837 (Ill. App. Ct. 1983)) (cited with approval in *1324 W. Pratt Condo. Ass'n v. Platt Constr. Grp., Inc.*, 936 N.E.2d 1093, 1097-99 (Ill. App. Ct. 2010)))..

lawsuit under a reservation of rights (*id.*, ¶ 7), although it referred in its reservation of rights letter only to "CSC Construction," (Def.'s App., Ex. 5, ECF No. 24-7), and Juan Salgado testified at his deposition[2] that CSC Glass is also known as CSC Construction (Def.'s LR 56.1 Stmt., ¶ 63, ECF No. 20).

Metro North entered into a settlement agreement with the CSC entities in which the CSC entities agreed to pay Metro North "$700,000, to be satisfied solely through the assignment [to Metro North] of all of their rights to payment, if any, from Allied under the policy issued to [the] CSC [entities] by Allied, or rights under any other insurance policy issued to [the] CSC [entities], as arising out of the claims asserted against [the] CSC [entities] in the [underlying lawsuit] or this Settlement thereof." (Def.'s LR 56.1(b)(3)(B) Resp., ¶ 8, ECF No. 22.) According to the settlement agreement, the settlement figure represented "a reasonable settlement amount of a portion of the damages incurred by [Metro North] as caused in part by CSC's alleged improper installation of the windows that caused damage to parts of the Building, other than the windows themselves, and damage to [Metro North]'s and its members' personal property." (*Id.*, ¶ 18.).

The Allied policy requires Allied to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' . . . caused by an occurrence." (*Id.*, ¶ 31.) Similarly, the AMCO policy, which provided both excess follow-form coverage and primary commercial liability insurance with no retained limit (Def.'s LR 56.1 Stmt., ¶¶ 55-56, ECF No. 20), requires AMCO to pay "on behalf of the 'insured' damages the 'insured' becomes legally obligated to pay by reason of liability imposed by law . . . because of . . . 'property

---

[2] Plaintiffs move to strike the deposition of Juan Salgado (ECF No. 26, at 2-3), as well as to strike Metro North's combined memorandum in support of its motion for summary judgment and in opposition to plaintiffs' motion (ECF No. 25, at 1-2). These motions are denied. The motion to strike the deposition is moot, as the Court does not reach the issue of which CSC entity performed the work in this case or which entity was insured. The motion to strike the combined brief is denied because the Court intended the parties to file 30-page combined memoranda and, in any case, plaintiffs are not prejudiced.

3

damage' . . . caused by an occurrence." (Def.'s LR 56.1(b)(3)(B) Resp., ¶ 31, ECF No. 22.) Plaintiffs seek a declaration that there is no coverage under the policies for Metro North's settlement with the CSC entities. Metro North seeks a declaration that its settlement with the CSC entities is covered by both policies and plaintiffs must pay Metro North, as assignee of the CSC entities' rights under the policies, the full amount of the settlement.

## ANALYSIS

The parties have filed cross-motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Kvapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

Metro North's settlement with the CSC entities is covered under plaintiffs' policies if the CSC entities settled the case in reasonable anticipation of liability for damages that fall within the policies' definition of "property damage" caused by an "occurrence." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 350-52 (7th Cir. 2010). Property damage

is defined in plaintiffs' policies as "physical injury to tangible property," (Def.'s LR 56.1 Stmt., ¶ 48, ECF No. 20) and "occurrence" is defined as an "accident" (*id.*, ¶ 47). Under Illinois law, it is well-established that a construction defect is not an "occurrence" or "accident"; rather, it is the natural and ordinary consequence of poor workmanship. *See Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 689-90 (7th Cir. 2008) (citing cases). CGL policies "are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses." *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 503 (2001) (citing *Qualls v. Country Mut. Ins. Co.*, 462 N.E.2d 1288, 1291 (Ill. App. Ct. 1984)). Stated differently, CGL policies do not cover "an accident of faulty workmanship but rather faulty workmanship which causes an accident." *Monticello Ins. Co. v. Wil-Freds Const., Inc.*, 661 N.E.2d 451, 457 (Ill. App. Ct. 1996).

Illinois courts hold that "there is no occurrence when a subcontractor's defective workmanship necessitates removing and repairing work," *Milwaukee Mutual Insurance Co. v. J.P. Larsen, Inc.*, 956 N.E.2d 524, 531 (Ill. App. Ct. 2011) (citing *Viking Construction Management, Inc. v. Liberty Mutual Insurance Co.*, 831 N.E.2d 1, 6 (Ill. App. Ct. 2005)), but when the defective workmanship results in damage to something *other* than the construction project itself, there may be an occurrence, *id.* (citing *CMK Development Corp. v. West Bend Mutual Insurance Co.*, 917 N.E.2d 1155, 1164-65 (Ill. App. Ct. 2009), *Stoneridge Dev. Co. v. Essex Ins. Co.*, 888 N.E.2d 633, 653 (Ill. App. Ct. 2008)). Thus, where faulty workmanship by the subcontractor who compacted the soil on which a home rests results in cracks in the home's load-bearing elements, there is no occurrence causing covered property damage, *Stoneridge*, 888 N.E.2d at 654, but where faulty workmanship results in leaks that cause water damage to the

5

homeowner's furniture, clothing and antiques, there *is* an occurrence causing covered property damage, *see Pekin Insurance Co. v. Richard Marker Associates, Inc.*, 682 N.E.2d 362, 365-66 (Ill. App. Ct. 1997).

According to a breakdown of damages tendered by Metro North's counsel to the CSC entities' counsel during settlement negotiations, Metro North was seeking more than $2.3 million in damages. (Def.'s App., Ex. 6, ECF No. 24-8.) The vast majority of the damages Metro North claimed related to damage caused by water infiltration to common elements of the condominium building, other than the windows that represented the precise portion of the building that the CSC entities actually worked on. (Def.'s Reply Br. at 9, ECF No. 27) (citing Def.'s App., Ex. 6, ECF No. 24-8.) Metro North also claimed $191,215.15 in damages for "personal or other property." (Def.'s App., Ex. 6, ECF No. 24-8.)

Plaintiffs argue that their policies do not cover Metro North's BIWH claim because (1) the damages Metro North claimed are not recoverable for BIWH, so the settlement could not have been entered into in reasonable anticipation of liability. Further, even if the damages Metro North sought are theoretically recoverable in a BIWH action, they argue that (2) the damages related to personal property of the unit owners were not recoverable in the underlying action because the unit owners were not parties to the underlying action, so the settlement as to those damages was not based on a reasonable anticipation of liability, and (3) the damages related to portions of the common elements of the condominium building other than those on which the CSC entities worked were not caused by an "occurrence" because they were merely the natural and ordinary consequences of faulty workmanship.

## I. BREACH OF IMPLIED WARRANTY OF HABITABILITY DAMAGES

Under Illinois law, the measure of damages for BIWH is "the cost of correcting the defective conditions," unless "defects could be corrected only at a cost unreasonably disproportionate to the benefit to the purchaser, or . . . correcting them would entail unreasonable destruction of the builder's work," in which case "the amount by which the defects have reduced the value of the property should be the measure of damages." *Park v. Sohn*, 433 N.E.2d 651, 657 (Ill. 1982). The damages covered by the CSC entities' settlement agreement with Metro North were not for the cost of repairing the defects (which the policies undisputedly do not cover) or for the diminution in the value of the building, but for the cost of repairing other parts of the condominium building on which the CSC entities did not work or for personal property of the unit owners. Plaintiffs argue that Illinois law does not permit the recovery of any such damages for BIWH, and if the damages that were the basis for the settlement agreement are unrecoverable, the settlement was not "in reasonable anticipation of liability." *See Santa's Best Craft*, 611 F.3d at 350-52.

Metro North responds that a contractor who breaches the implied warranty of habitability is liable for whatever costs are necessary to correct the defective condition of the premises due to the contractor's breach, principally citing *Nisbet v. Yelnick*, 464 N.E.2d 781, 784-85 (Ill. App. Ct. 1984), which allowed the BIWH plaintiffs to recover consequential damages for loss of use of their basement while defects were being repaired, which Metro North claims is "directly on point." (Def.'s Reply Mem. at 14, ECF No. 27.) Metro North fails to mention that, in a later case, the Illinois Appellate Court limited the recovery of consequential damages for BIWH to situations in which the premises are "uninhabitable," and it held that the plaintiffs could not recover "consequential damages arising from water leakage into the interior of their unit"

through a defective window for BIWH. *Hills of Palos Condo. Ass'n, Inc. v. I-Del, Inc.*, 626 N.E.2d 1311, 1329 (Ill. App. Ct. 1993). That case is much closer to the facts of this case than *Nisbet*; in fact, it is directly on point. Damages caused by water infiltration into parts of the building on which the CSC entities did not work and into the individual units are not recoverable based on the CSC entities' BIWH.

Metro North argues that the proper inquiry is whether it entered into the settlement in reasonable anticipation of liability, not whether the court in the underlying action would or should actually have awarded consequential damages. Metro North is correct that the proper standard is whether the CSC entities entered into the settlement in "reasonable anticipation of liability," *Santa's Best Craft*, 611 F.3d at 350 (citing *U.S. Gypsum Co. v. Admiral Insurance Co.*, 643 N.E.2d 1226, 1244 (Ill. App. Ct. 1994)), but if no damages covered by the insurance policies could even potentially have been awarded, then the insurers are not required to pay the settlement because "it is inequitable to require an insurer to pay for a settlement that is clearly not within the terms of its policy," *id.* at 352. In *Hills of Palos*, a case closer to the facts of this case than any either party has cited, the Illinois Appellate Court specifically held that damages such as those Metro North sought are not recoverable for BIWH. There was no reasonable anticipation of liability or reasonable potential for the award of damages covered by the insurance policies. The insurers are not required to pay the Metro North settlement.

## II. PERSONAL PROPERTY OF THE UNIT OWNERS

Even assuming that Metro North might have been entitled to damages if it prevailed on the underlying claim, it would not be entitled to recover for any damage to personal property of its unit owners. As this Court previously explained in its decision in *Acuity v. Lenny Szarek, Inc.*, No. 13 C 7505, 2015 WL 5163195, at *6 (N.D. Ill. Sept. 2, 2015), the provision of the

Illinois Condominium Property Act permitting a condominium association to "act in a representative capacity in relation to matters involving the common elements *or more than one unit*, on behalf of the unit owners, as their interests may appear," 765 Ill. Comp. Stat. 605/9.1(b) (emphasis added), does not give a condominium association the right to sue for property damage suffered by individual unit owners.

In support of its argument to the contrary, Metro North cites the Illinois Appellate Court's decision in *Sandy Creek Condominium Association v. Stolt & Egner, Inc.*, 642 N.E.2d 171, 175-76 (Ill. App. Ct. 1994), which held that a condominium association could assert a claim against the condominium developer for defrauding the individual unit owners. While this case may appear to provide some support for Metro North's position, its analysis of the issue is scant, and the portion addressing the association's standing to assert the unit owners' fraud claims was ultimately not a critical element of the decision because the court held that the evidence was insufficient to support the unit owners' fraud claims, in any case, and it reversed the jury's verdict for the association on the fraud count.

More persuasive to this Court is the Illinois Appellate Court's subsequent decision in *Poulet v. H.F.O., LLC*, 817 N.E.2d 1054, 1064-65 (Ill. App. Ct. 2004), in which the court drew a distinction between "individual" and "collective" claims (the former are the province of the individual unit owners, whereas the latter are the province of the condominium association) and suggested that claims (such as the ones in *Sandy Creek*) that the condominium developer defrauded the individual unit purchasers as to certain aspects of the construction of the condominium belong in the collective category. *See id.* (citing *Frantz v. CBI Fairmac Corp.*, 331 S.E.2d 390, 393-94 (Va. 1985)). As to such claims, the association has the exclusive authority to act (except where it declines to act, in which case the unit owners may bring a

9

derivative action), and the association's actions bind the unit owners. *Poulet*, 817 N.E.2d at 1064-65 (citing *Frantz*, 331 S.E.2d at 393-94). On the other hand, claims that the developer breached the unit purchasers' individual contract rights, including claims of breach of the implied warranty of habitability, belong in the individual category. *See id.* at 1062 (citing *Tassan v. United Dev. Co.*, 410 N.E.2d 902, 914 (Ill. App. Ct. 1980)).

In *Poulet*, as a condominium association negotiated a settlement in a lawsuit it had brought against the condominium developer for mishandling funds, an individual unit owner brought his own lawsuit against the developer, asserting claims of conversion and fraud similar to those in the association's suit. *Poulet*, 817 N.E.2d at 1055-59. In its opinion, the court discussed the importance of maintaining the condominium association's exclusive right to assert and settle collective claims such as those concerning the handling of association funds:

> To allow the individual unit owners here to assert claims of conversion and common law constructive fraud relating to the Association's account would, as stated by the court in *Frantz*, deprive the Association of its right to act on behalf of all unit owners, *leave the responsibility for and authority over the funds fragmented and ultimately make the vindication of common rights highly uncertain, difficult and burdensome.* Further, . . . piecemeal litigation brought by individual unit owners would frustrate the statutory scheme in which the condominium associations are to act as the representatives of all the individual owners. We also believe that our finding here avoids a multiplicity of lawsuits, produces economic savings incident to one trial, has a positive effect on judicial administration and expedites the resolution of controversies.

*Id.* at 1067-68 (emphasis added). However, the court explained that individual unit owners retain the right to bring claims of an "'individual character,' such as the . . . breach of warranty claims in *Tassan*." *Id.* at 1068 (quoting *Cigal v. Leader Dev. Corp.*, 557 N.E.2d 1119, 1121 (Mass. 1990)).

Although *Poulet* directly concerned only whether an individual unit owner had standing to assert a claim of injury to the association, not the mirror-image issue that this case presents, it follows from the reasoning of the decision that the association's standing to bring collective

claims must not overlap with the unit owners' right to bring individual claims, in order to avoid uncertainty about whether an action by one party binds the other. If an individual unit owner has the right to bring a breach of implied warranty claim against the developer—which he or she undisputedly does—then it follows that the association does not, at least absent the consent of the individual unit owners, *see River Plaza Homeowner's Association v. Healey*, 389 Ill. App. 3d 268, 281-82 (Ill. App. Ct. 2009). As one commentator has put it, "in a 100 unit building, there could be 101 lawsuits for fraud—one for each unit purchaser plus the association." Richard Douglass, *Interpreting Section 9.1(b) of the Illinois Condominium Property Act*, CBA Rec., July/August 2015, at 28, 34. More to the point, the association could bring a lawsuit, and then just as it was nearing its conclusion one or more unit owners would be able to bring their own lawsuits, potentially snarling the proceedings. In this case, the unit owners were perfectly free to join in Metro North's lawsuit if they wanted an individual recovery, as the unit owners in *Hills of Palos* did. Allowing Metro North to recover for the damage to their personal property without their participation in the lawsuit does not comport with the Illinois Condominium Property Act as the Illinois Appellate Court has interpreted it in *Poulet*.

### III. "OCCURRENCE"

In any case, Metro North admits that only a very small portion of the damages it claimed in its settlement negotiations with the CSC entities related to the damage to personal property of the unit owners. Of the $2.3 million in claimed damages, only approximately $195,000 related to the damage to personal property, less than a tenth of the total claimed damages and a little more than a quarter of the settlement amount. The settlement agreement does not state how much of the settlement amount to apportion to which claimed damages other than to state that the "amount represents a reasonable settlement of a portion of the damages incurred by the

11

Association as caused in part by CSC's alleged improper installation of windows that caused damage to parts of the Building, other than the windows, themselves, and damage to the Association's and its members' personal property." (Ans. Countercl., Ex. 7, ECF No. 10-9, ¶ 2.)

Where a settlement encompasses multiple claims and it is unclear how much, if any, of a settlement is attributable to a covered claim as opposed to an uncovered claim, courts must "evaluate whether a 'primary focus' of the claims that were settled was a potentially covered loss." *Santa's Best Craft*, 611 F.3d at 352 (quoting *Commonwealth Edison Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 752 N.E.2d 555, 565 (Ill. App. Ct. 2001)). In this case it seems clear, and Metro North essentially concedes (Reply Br. at 9, ECF No. 27), that the damage to personal property of the unit owners was not a primary focus of the settlement; even if the maximum amount of claimed personal property damages were represented in the settlement amount, it would represent barely a quarter of the full settlement.

Thus, the question becomes whether the claimed damages for damage to the portions of the building on which the CSC entities did not work, which apparently were the "primary focus" of the settlement, are covered. Plaintiffs recite a litany of Illinois cases holding that, where an insured contractor's faulty workmanship results in damage to the structure on which he worked, there is no "occurrence" causing covered "property damage" within the meaning of a CGL policy because there is no "accident"; rather, the damage is the natural and ordinary consequence of faulty workmanship. (Pls.' Resp./Reply Br., ECF No. 25, at 6-9.)

Metro North responds that these cases are all distinguishable because the insured contractors were general contractors, developers or other entities who were responsible for the entire project. Thus, the claimed damage was merely damage to the insured's own work that was caused by its own poor workmanship or that of its subcontractors, and defective

12

workmanship that requires "removing and repairing work" is not an "occurrence" within the meaning of a CGL policy, *Viking Construction*, 831 N.E.2d at 6; further, such property damage is expressly excluded by standard CGL policies. Metro North cites instead *Milwaukee Mutual Insurance Co. v. J.P. Larsen, Inc.*, 956 N.E.2d 524, 532 (Ill. App. Ct. 2011), a factually analogous case in which the Illinois Appellate Court held that an insurer had a duty to defend a subcontractor that had improperly sealed windows in a condominium building, causing water infiltration that damaged the common elements of the condominium and the personal property of the unit owners.

Plaintiffs have the better of this argument. Although Metro North is correct that many of the cases upon which plaintiffs rely involve insured general contractors, rather than subcontractors whose defective work results in damage to portions of the building on which they did not work, this is a distinction without a difference because these cases do not turn on which portion of the building was damaged; rather, they turn on the principle that a construction defect is not an "accident," which Illinois courts have defined as "an event that is unforeseen and neither expected nor intended," *Diamond State Insurance Co. v. Chester-Jensen Co.*, 611 N.E.2d 1083, 1091 (Ill. App. Ct. 1993), and because CGL policies only cover damage caused by an "occurrence," which is defined as an "accident," they do not cover the natural and ordinary consequences of defective workmanship. When a subcontractor who installs windows performs defective work, the natural and ordinary consequence is water infiltration that will damage the rest of the building. There is no accident, so there is no occurrence, so there is no coverage. *See Am. Fire & Cas. Co. v. Broeren Russo Constr., Inc.*, 54 F. Supp. 2d 842, 847-48 (C.D. Ill. 1999) ("[I]t is inconceivable that the parties would not have foreseen damage from water leaking into

the building as a possible result of the failure of the [window contractor's installation work] to prevent leaking."), *cited with approval in Stoneridge*, 888 N.E.2d at 656.

As stated above, a CGL policy is not meant to cover "an accident of faulty workmanship but rather faulty workmanship which causes an accident." *Monticello Ins. Co.*, 661 N.E.2d at 457. Thus, where the window installer's poor workmanship causes water infiltration which damages an antique rug, there is "faulty workmanship which causes an accident"; the presence of that rug in that location was not something the window installer necessarily could have foreseen—but he could hardly fail to foresee that, if his work was defective, the defects would result in damage to the structure in which he was installing windows. *See Pekin Ins. Co.*, 682 N.E.2d at 365-66.

*Stoneridge* dispels any notion that the cases on which plaintiffs rely depend on the fact that the insured was a general contractor who worked on the entire structure. In that case, homeowners sued the developer/general contractor who had built their house for improperly compacting the soil on which the house was built, causing cracks in the load-bearing elements of the home. *Stoneridge*, 888 N.E.2d at 654. The Illinois Appellate Court discussed at length the long line of cases holding that there is no coverage for repairing and replacing an insured contractor's defective work because, under such circumstances, there is no occurrence causing covered property damage. *Id.* at 651-55. The court then addressed the contractor's argument that, viewing the policy as a whole, it was clearly intended to provide coverage for faulty work performed by a subcontractor. *Id.* at 656. The contractor argued that the policy excluded "'property damage' to 'your work' arising out of it or any part of it," but there was an exception to this exclusion "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor," as the faulty soil compaction undisputedly was.

14

*Id.* The court held that the subcontractor exception "cannot negate the lack of an 'occurrence' here, as the damage arose from the natural and ordinary consequence of defective workmanship rather than from an 'accident.'" *Id.* at 657. Stated differently, there was no need to interpret exclusions or exceptions because there was no coverage to begin with. *Id.* at 656-57.

If, as Metro North claims, it mattered that the insured was a general contractor responsible for the whole building rather than a subcontractor who performed faulty work on only a portion of the building, that fact would have militated in favor of coverage because the court would have had to analyze the "your work" exclusion and the subcontractor exception, and it may have found that the claim covered based on the subcontractor exception. The court did not perform that analysis because regardless of who performed the work and what the subcontractor's scope of work was, damage to a structure due a subcontractor's faulty work is not "property damage" caused by an "occurrence."

Metro North also cites *Ohio Casualty Insurance Co. v. Bazzi Construction Co.*, 815 F.2d 1146, 1147-48 (7th Cir. 1987), in which the Seventh Circuit held that a property owner's claim against an insured contractor who built a second story on top of the roof of a garage, which "compromised the integrity of the whole building" and required the garage owner to "reinforce the roof joists and steel columns installed in the interior of the building because the foundation of the existing building was inadequate to support the second floor construction," was at least potentially covered because the faulty workmanship damaged something other than the construction project itself, namely, the existing structure of the garage. First, this case is distinguishable because (like *J.P. Larsen*) it is a duty to defend case, and the duty to defend arises whenever there is even the potential for coverage. *Viking Constr.*, 831 N.E.2d at 6. The property owner in *Bazzi* asserted claims of negligence against the insured contractor, but this

15

case includes only a BIWH claim; as plaintiffs admit, they too saw the potential for coverage in this case before the negligence claims against the CSC entities were dismissed, which is why they defended the CSC entities under a reservation of rights. (Pls.' Resp./Reply Br., ECF No. 25, at 2-3.) It is unclear from the opinion in *Bazzi* to what extent the damage to the structural integrity of the existing structure of the garage may have truly been an accident, as opposed to the natural and ordinary consequence of defective workmanship; this is a far cry from contractual claims brought against a window contractor, as in *Broeren Russo* (a decision by a court that would have been bound by *Bazzi*, if it applied) or this case. The Court notes that if the Seventh Circuit thought that *Bazzi* applied to condominium associations' claims against contractors whose defective construction caused water infiltration, it might at least have mentioned the case in *Nautilus Insurance Co. v. Board of Directors of Regal Lofts Condominium Ass'n*, 764 F.3d 726, 729 (7th Cir. 2014), which contained precisely those facts, and which also involved inadequate remodeling of an existing building. *See id.* ("[T]he deteriorated conditions had likely developed over many years, even prior to the condominium conversion, but . . . the present water penetration was the result of inadequate restoration of the walls to a water-tight, serviceable condition.").

      The parties raise a number of other issues, including which CSC entity actually performed the work in this case and whether both entities were properly insured by plaintiffs' policies, and whether various exclusions apply, but we need not reach these ancillary issues because, for the foregoing reasons, the plaintiff's insurance policies did not provide coverage for the CSC entities' settlement of the underlying lawsuit.

## CONCLUSION

For the reasons set forth above, the Court grants plaintiffs' motion for summary judgment [15] and denies Metro North's motion for summary judgment [18]. Civil case terminated.

**SO ORDERED.**                                         **ENTERED: March 31, 2016**

_____
**HON. JORGE L. ALONSO**
**United States District Judge**